# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 7, 2010 Session

## IN RE BERNARD T. ET AL.

**Appeal by Permission from the Court of Appeals, Western Section**
**Shelby County Juvenile Court**
**No. R3018      Herbert J. Lane, Special Judge**

---

**No. W2008-02803-SC-R11-PT - Filed August 26, 2010**

---

This appeal involves a termination of rights proceeding under Tenn. Code Ann. § 36-1-113 (Supp. 2009) with regard to five children between the ages of twelve and seventeen. The Tennessee Department of Children's Services removed the children from the custody of their biological mother and the person thought to be their biological father and entered into a series of permanency plans with them for the next three and one-half years. Shortly after discovering that the putative father was not the biological father of two of the children, the Department filed a termination petition in the Shelby County Juvenile Court. The juvenile court entered an order on October 31, 2008, terminating both the biological mother's and the putative father's parental rights. The putative father appealed the juvenile court's decision to terminate his parental rights based on both Tenn. Code Ann. § 36-1-113(g)(2)-(3) and Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), (vi). While the Court of Appeals affirmed the juvenile court's finding that grounds for termination of the putative father's rights existed, the court reversed the judgment terminating the putative father's rights based on the majority's conclusion that the Department had failed to prove that it had made reasonable efforts to assist the putative father to address the causes for termination under Tenn. Code Ann. § 36-1-113(g)(2)-(3). The majority also reversed the termination of the father's rights under Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), (vi) because the Department had failed to aid the putative father in establishing paternity. *State, Dep't of Children's Servs. v. Tina T. (In re B.T.)*, No. W2008-02803-COA-R3-PT, 2009 WL 3681884 (Tenn. Ct. App. Nov. 5, 2009). We granted the Department's Tenn. R. App. P. 11 application. We have determined that the Department used reasonable efforts to assist the putative father to establish his parentage and to regain custody of his biological and legal children and that the juvenile court properly terminated the putative father's rights with regard to all five children.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, GARY R. WADE, and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Lindsey O. Appiah, Assistant Attorney General, for the appellant, Tennessee Department of Children's Services.

Ada Johnson, Memphis, Tennessee, for the appellee, Junior D.

**OPINION**

**I.**

Junior D. first met Tina T. in middle school in Memphis. Tina T. was almost two and one-half years older than Junior D.[1] After Tina T. graduated from high school in 1978, she moved away from Memphis with her father. During the ten years she was away from Memphis, Tina T. had a non-marital child. This child accompanied Tina T. when she moved back to Memphis but later returned to live with his father's family.

Shortly after she returned to Memphis, Tina T. rekindled her friendship with Junior D. This relationship eventually became intimate. Junior D. proposed marriage to Tina T. on many occasions. Tina T., however, declined to marry Junior D. because their relationship was chaotic and physically abusive. Junior D. was arrested on domestic violence charges on more than one occasion.

Tina T. gave birth to Bernard T.[2] on March 2, 1993. Although Junior D. was not identified as the father on the child's birth certificate, Junior D. believed and understood that he was Bernard T.'s father. Tina T. gave birth to Judy T. on August 4, 1995 and Joshua T. on April 29, 1997. The birth certificates of these children did not identify their father; however, Junior D. believed and understood that he was also the biological father of these children. On November 9, 1998, Junior D. and Tina T. executed a consent order in the Shelby County Juvenile Court finding that Junior D. was the "natural father" of Bernard T., Judy T., and Joshua T.[3] This order gave Tina T. custody of the three children and obligated

---

[1]The Department of Children's Services used two birth dates for Junior D. – November 3, 1962 and May 3, 1968. We presume that Junior D.'s correct birth date is November 3, 1962.

[2]Even though the children are referred to by different names throughout this record, in this opinion, we are using the names appearing on their birth certificates.

[3]*Tenn. Dep't of Human Servs. v. Junior D.* (Shelby Juv. Ct. Nov. 9, 1998). This order was not included in the record on appeal. A certified copy of the order was, however, appended to Junior D.'s answer to the Department's Tenn. R. App. P. 11 application. Simply attaching a document to an appellate filing will not serve to place it in the record on appeal, especially when it was not part of the record of the trial court proceedings. *UT Med. Group, Inc. v. Vogt*, 235 S.W.3d 110, 122 (Tenn. 2007); *Vintage Health Res., Inc.*
(continued...)

Junior D. to pay $250 per month in child support. It also provided that the surnames of the three children should be changed to Junior D.'s surname.[4]

Tina T. gave birth to Jacquline T. on December 23, 1998. This child's birth certificate, like those of her three older siblings, did not list her biological father's name. However, Junior D. assumed and believed that he was Jacquline T.'s biological father. On March 1, 2003, Tina T. gave birth to Jordan T. Junior D. assumed and believed that he was Jordan T.'s biological father even though he was not listed as the father on the child's birth certificate.

The record is sparse regarding Tina T.'s and Junior D.'s relationship between her return to Memphis and 2003. Tina T. had psychiatric problems and in the mid-1990s, she became addicted to crack cocaine. Junior D. and Tina T. did not cohabit on a consistent basis. Tina T. moved often and was unable to remain steadily employed because of her substance abuse problem. She subsisted on Social Security benefits and welfare, although she frequently traded the food stamps she received for illegal drugs.

Junior D. worked at a series of construction and maintenance jobs following his graduation from high school. His longest period of employment was with the Tennessee Valley Authority ("TVA") from 1993 until 2005. He was not able to hold a steady job after TVA laid him off in 2005. While Tina T. had physical custody of the five children, Junior D. tried to stay actively involved in the children's lives. The record contains little evidence regarding how or if Junior D. provided financial support for the children. Tina T. testified that he did not support the children and wasted money in strip clubs. Junior D. testified that

---

[3](...continued)
*v. Guiangan*, 309 S.W.3d 448, 460 n.13 (Tenn. Ct. App. 2009). Likewise, this order could not have been included in a supplemental record in accordance with Tenn. R. App. P. 24(e) because it was not properly part of the record in the juvenile court.

While this Court may take judicial notice of evidentiary matters in proper circumstances, *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009), we customarily decline to take judicial notice of materials that are not properly included in the record on appeal. *Willis v. Tenn. Dep't of Corr.*, 113 S.W.3d 706, 713 n.6 (Tenn. 2003). Over the Department's objection, we have decided to take judicial notice of the juvenile court's November 9, 1998 order involving Junior D.'s parentage for three reasons. First, consideration of this order aids our appellate jurisdiction and the discharge of our obligation under Tenn. Code Ann. § 36-1-124 (b), (c) (2005) to expedite the final resolution of cases involving the termination of parental rights. Second, the order was entered by the same court in which the termination of parental rights proceeding was pending. Third, there is no question regarding the genuineness of the copy of the order appended to Junior D.'s brief because the juvenile court clerk has certified it as a true and correct copy of the order entered on the minutes of the juvenile court.

[4]The order explicitly stated that the children "shall henceforth be known as" Bernard D., Judy D., and Joshua D.

he provided the children with money and school uniforms after they were placed in the custody of the Department; however, he never testified that he paid child support.

Junior D.'s relationship with Tina T. ended in 2003 while she was still pregnant with Jordan T. However, he continued to interact with Tina T. when he was visiting with the children. On November 4, 2004, Junior D. observed a drug dealer pull a pistol on Tina T. in front of the children. On November 8, 2004, Junior D. filed a pro se petition in the Shelby County Juvenile Court alleging that the five children were dependent and neglected and requesting physical custody.[5] On November 10, 2004, the juvenile court temporarily placed the children in Junior D.'s custody.

On November 18, 2004, the Tennessee Department of Children's Services filed an intervening petition in the juvenile court.[6] The Department asserted that Junior D. had lied to the juvenile court about his employment status and living arrangements. In light of these allegations and the conditions in Tina T.'s home, the juvenile court immediately placed the children in the protective custody of the Department. On December 1, 2004, the juvenile court gave the Department temporary custody of the children.

On December 17, 2004, Junior D. convinced the Department to return the children to him. Even though he was homeless at the time, he told the Department that his mother would allow him and the children to live with her despite the fact that his mother had made it clear that she wanted nothing to do with any of the children.

Over the next several months, Junior D. struggled to maintain a stable home for the children. They moved repeatedly and once lived in a hotel room after they were forced to leave their apartment because Junior D. had a fight with another tenant. The children's meals often consisted of fast food. The children attended a number of different schools, when they attended school at all. Judy T. explained that she and her siblings often missed school because "[D]ad was a sleepy head." Without the Department's knowledge, Junior D. allowed Tina T. to have unsupervised physical custody of the children because he was required to work and his mother refused to watch the children.

Bernard T., the oldest of the five children, developed a serious sinus infection because of the squalid conditions in Tina T.'s home. Junior D. left the sinus infection untreated, and

---

[5]Consistent with the juvenile court's November 9, 1998 order, the style of this petition and the supporting affidavits identified the three oldest children using Junior D.'s surname. The remaining two children who were not covered by the November 9, 1998 order were identified using Tina T.'s surname, the name that appeared on their birth certificates.

[6]The Department's petition also used the surnames for the children that were consistent with the juvenile court's November 9, 1998 order.

it worsened to the point that Bernard T. required surgery in February 2005. The juvenile court awarded the Department temporary custody of Bernard T. because Junior D. was unable to manage the boy's post-operative care. The Department placed Bernard T. in a home for medically fragile children in Knoxville. Bernard T. was never returned to Junior D. because of his health condition and reports of his inappropriate conduct with one of his siblings and two other children.

In April 2005, the Department briefly removed the four remaining children from Junior D.'s custody after Tina T. accused him of sexually abusing them. The Department returned the children to Junior D. after determining that the allegations were unfounded. On May 6, 2005, the juvenile court determined that the children were dependent and neglected and returned them to the Department's custody after finding that they had attended three different schools since February 2005, that they had witnessed Tina T. smoking crack cocaine, and that Junior D. had failed to provide them with stable housing. The court also determined that the Department had been attempting to provide services to Junior D. but that Junior D.'s frequent moves were hindering the provision of these services.

Between May 23, 2005 and May 18, 2008, the Department worked with Junior D. to address the conditions that led to the removal of the children from his custody. The Department entered into eight permanency plans involving Junior D. and the children. While Junior D.'s obligations under these plans changed from time to time, they included: (1) maintaining stable housing and a steady income; (2) ensuring that the children attended school; (3) establishing his parentage of the children;[7] (4) completing a mental health evaluation and following the recommendations; (5) completing parenting classes; (6) attending a domestic violence class; (7) participating in family counseling; and (8) identifying a support system to help him with his parenting responsibilities.

To assist Junior D. with these responsibilities, the Department provided Junior D. with a variety of services and referrals. It arranged for him to attend parenting classes at the Exchange Club, and it arranged for a mental health examination at Le Bonheur Center for Children and Parents at the State's expense. The Department also arranged for Junior D. to attend family counseling sessions with Tina T. and the children and provided classes at Health Connect and the South Memphis Alliance to assist with budgeting and setting and achieving goals. On occasion, the Department provided Junior D. with grocery money and bus passes to visit Bernard T. in Knoxville and to attend his various appointments. Finally, the Department assigned Junior D. a parenting aide to assist him with his responsibilities.

Junior D. did not have consistent success in achieving the goals in the various permanency plans he entered into with the Department. While he completed some parenting

---

[7]This obligation first appeared in the revised permanency plan dated September 2, 2005.

classes and agreed to a mental health evaluation, Junior D. was unable to maintain steady employment or to find stable housing. He missed a number of scheduled appointments and some visitations with the children. He also failed to take the domestic violence training, to complete the family counseling sessions, and to identify a support system to help him with his parenting responsibilities. In addition, Junior D. failed to use the parenting aide that the Department had provided him. Accordingly, in the last permanency plan dated January 16, 2008, the Department changed the objective of its efforts to either reunification or adoption.

For reasons that are not apparent in the record, the Department decided to conduct genetic testing to ascertain whether Junior D. was the biological father of the five children who had been the focus of the Department's efforts since 2004. These tests were conducted in January and February of 2008. They revealed that Junior D. was the biological father of Judy T., Joshua T., and Jacquline T. but that he was not the biological father of Bernard T. and Jordan T.[8]

On May 18, 2008, the Department filed a Tenn. Code Ann. § 36-1-113 petition to terminate Tina T.'s and Junior D.'s rights with regard to the children. Based on the recent genetic tests, the petition alleged that Junior D. was the biological father of Judy T., Joshua T., and Jacquline T. While the petition alleged that Junior D. had been "living openly with the children as the father of the children when the children were removed from the home" and that Junior D. had informed the Department that he believed that he was the children's biological father, it failed to mention that Junior D. was the legal father of Bernard T., Judy T., and Joshua T. by virtue of the juvenile court's November 9, 1998 order. For the first time, the Department alleged that Michael P. was Bernard T.'s biological father and that Emmanuel G. was the biological father of Jordan T.[9]

The juvenile court conducted a hearing on the Department's termination petition on October 21, 2008. During the hearing, Junior D. testified that he changed jobs frequently seeking better pay. He claimed that he was currently employed but was able to produce only a one-month pay stub to verify the length of his employment. Junior D. had conceded to a social worker that his current salary did not enable him to support the children. However, he testified that he had saved $9,000 to pay for law school and that he planned to complete his studies in five years. He stated that he planned to continue to work while attending law school to support the children.

---

[8]By virtue of the juvenile court's November 9, 1998 order, Junior D. was already the legal father of Bernard T., Judy T., and Joshua T.

[9]The Department alleged that Tina T. had "made a sworn statement or other credible and reliable statement" that these men were the biological fathers of these children. The Department also alleged that Emmanuel G. was deceased.

Junior D. also testified that he had recently purchased a house but that it was not currently habitable. A Department employee testified she had been unable to verify this claim because Junior D. had refused to give her the address of the house. Junior D. conceded that his mother would not allow the children to stay with her. In addition, he denied that he had been provided services at the South Memphis Alliance or Health Connect. However, he insisted that he had a support group, including a number of ministers, who were providing assistance. A Department employee testified that she had been unable to verify that these persons were assisting Junior D.

Junior D. recalled taking the genetic tests conducted in January and February 2008. When asked to explain how the results were communicated to him, Junior D. responded that "[s]he just told me all the kids and some in the paperwork. I didn't believe none of it. She can tamper with stuff." He also insisted that he had tried to follow up by establishing parentage by testifying, "I came up here [to the juvenile court] and everything and tried to do it myself, and they told me that I had to have some paper and stuff."

On October 31, 2008, the juvenile court entered an order terminating the parental rights of Tina T., Junior D., and the two other persons identified in the petition as the biological fathers of two of the children. The court found that the Department had "provided Herculean efforts" to assist Tina T. and Junior D. and that Junior D. had "failed to complete the most important tasks." Specifically, the court found that the Department had presented clear and convincing evidence that Junior D. had (1) failed to maintain stable housing, (2) failed to maintain steady employment, (3) failed to follow the recommendations following the mental health examination, (4) failed to establish his parentage, (5) failed to demonstrate that he was able to support the children financially, (6) failed to notify the Department of his continuing problems with housing and employment, and (7) failed to identify a support system.

In accordance with Tenn. Code Ann. § 36-1-113(g)(2)-(3), the juvenile court terminated Junior D.'s rights because he had failed to substantially comply with the responsibilities in his permanency plans because the conditions that led to the removal of the children from his custody persisted, and because there was little likelihood that these conditions would be remedied in the near future. At the same time, in accordance with Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), (vi), the juvenile court terminated Junior D.'s rights because he had failed to manifest the ability and willingness to assume legal and physical custody of the children and because he had failed to file a petition to establish his paternity. The court concluded that awarding legal and physical custody of the children to Junior D. would "pose a risk of substantial harm to the physical or psychological welfare of the children." Finally, the court found that the Department had presented clear and convincing evidence that the children's interests would be best served by terminating Tina T.'s and Junior D.'s rights with regard to the children.

Junior D. appealed the judgment terminating his rights to all five children to the Court of Appeals.[10] In an opinion filed on May 7, 2009, a divided panel of the Court of Appeals found that Junior D.'s obligations in the various permanency plans were reasonable, that Junior D. had failed to comply substantially with these requirements, and that the conditions that led to the children's removal from Junior D.'s custody persisted. *State, Dep't of Children's Servs. v. Tina T. (In re B.T.)*, No. W2008-02803-COA-R3-PT, 2009 WL 3681884, at *6-9 (Tenn. Ct. App. Nov. 5, 2009).[11] However, the Court of Appeals reversed the termination of Junior D.'s parental rights under Tenn. Code Ann. § 36-1-113(g)(2)-(3) based on its conclusion that "the record does not support the trial court's finding that DCS made 'Herculean efforts' or even reasonable efforts in assisting Father with finding and maintaining stable housing and income." *State, Dep't of Children's Servs. v. Tina T.*, 2009 WL 3681884, at *10. Accordingly, the majority found that the Department "did not exert reasonable efforts as required by Tennessee Code Annotated section 37-1-166." *State, Dep't of Children's Servs. v. Tina T.*, 2009 WL 3681884, at *11.

Turning to the termination of Junior D.'s parental rights under Tenn. Code Ann. § 36-1-113(g)(9)(A), the majority found that the Department had not proved that it "aided [Junior D.] in establishing paternity as required by the permanency plans." *State, Dep't of Children's Servs. v. Tina T.*, 2009 WL 3681884, at *13. Accordingly, the majority reversed the termination of Junior D.'s parental rights because the Department failed to exert reasonable efforts to assist him with obtaining stable employment and housing and failed to aid him in establishing himself as the legal father of Judy T., Joshua T., and Jacquline T. *State, Dep't of Children's Servs. v. Tina T.*, 2009 WL 3681884, at *13-14.[12]

In her dissenting opinion, Judge Kirby disagreed with her colleagues' analysis of the grounds for terminating Junior D.'s parental rights under Tenn. Code Ann. § 36-1-113(g)(9). As Judge Kirby construed the statute, the Department was not required to use reasonable efforts to assist a person who was not a child's legal parent with any of the obligations or responsibilities identified in Tenn. Code Ann. § 36-1-113(g)(9), and the Department had no responsibility to assist a biological father who was not a child's legal parent to establish his legal rights. *State, Dep't of Children's Servs. v. Tina T.*, 2009 WL 3681884, at *14, 17 (Kirby, J., dissenting). Judge Kirby expressed concern that the "practical ramifications" of

[10]Tina T. did not appeal the termination of her parental rights.

[11]We have altered the case name as reported to conceal Tina T.'s surname.

[12]The majority cited *State, Dep't of Children's Servs. v. Williams*, No. W2008-02001-COA-R3-PT, 2009 WL 2226116 (Tenn. Ct. App. July 28, 2009) (No Tenn. R. App. P. 11 application filed) and *In re S.T.T.*, No. M2007-01609-COA-R3-PT, 2008 WL 162538 (Tenn. Ct. App. Jan. 17, 2008) (No Tenn. R. App. P. 11 application filed) as authority for imposing on the Department the requirement of aiding persons who were not the legal parents of a child who was the subject of a termination of parental rights proceeding to establish their parentage.

the majority's holding are "potentially staggering for DCS, a department already faced with tremendous burdens and scarce resources." *State, Dep't of Children's Servs. v. Tina T.*, 2009 WL 3681884, at *18 (Kirby, J., dissenting). Accordingly, Judge Kirby stated that she would affirm the termination of Junior D.'s parental rights under Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), (vi) and, therefore, that she would pretermit the issues associated with the termination of Junior D.'s parental rights under Tenn. Code Ann. § 36-1-113(g)(2)-(3). *State, Dep't of Children's Servs. v. Tina T.*, 2009 WL 3681884, at *18 (Kirby, J., dissenting).

We granted the Department's Tenn. R. App. P. 11 application for permission to appeal to address four issues. The first issue relates to the timeliness of the manner in which the Department undertook to ascertain the putative father's legal relationship with the children at the center of this proceeding. The second issue involves the existence and extent of the Department's obligation or responsibility to aid persons who are not a child's legal parents to establish their legal rights with regard to a child. The third issue involves the sufficiency of the Department's evidence to establish grounds for termination under both Tenn. Code Ann. § 36-1-113(g)(2)-(3) and Tenn. Code Ann. § 36-1-113(g)(9) and the reasonableness of the Department's efforts with regard to the applicable grounds. The fourth issue involves the sufficiency of the Department's evidence that terminating Junior D.'s parental rights is in the children's best interests.

## II.

Proceedings under Tenn. Code Ann. § 36-1-113 are tried to the court without a jury. Accordingly, appellate courts review the trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Angela E.*, 303 S.W.3d 240, 246 (Tenn. 2010). Thus, reviewing courts will review the trial court's findings of fact de novo on the record and will accredit these findings unless the evidence preponderates otherwise. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546;

*State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under Tenn. R. App. P. 13(d). *See In re Adoption of A.M.H.*, 215 S.W.3d at 809. In light of the heightened burden of proof in proceedings under Tenn. Code Ann. § 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d at 447-48; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n.13 (Tenn. Ct. App. 2004).

Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d at 246; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

### III.

The concept of "family" is one of the fundamental building blocks of American society. Parental autonomy is the cornerstone of this concept. *Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977); *see also Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *Davis v. Davis*, 842 S.W.2d 588, 601 (Tenn. 1992); *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 182 (Tenn. Ct. App. 2000). Accordingly, public policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference. *Bellotti v. Baird*, 443 U.S. 622, 638 (1979); *Doe v. Sundquist*, 2 S.W.3d 919, 926 (Tenn. 1999); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993).

Many of the characterizations of the importance of the family have involved the traditional nuclear family – a married heterosexual couple and their children, if any. *See* Tenn. Code Ann. § 36-3-113(b) (2005); *Perrin v. Perrin*, 201 Tenn. 354, 366, 299 S.W.2d 19, 24 (1957); *McCormick v. State*, 135 Tenn. 218, 226, 186 S.W. 95, 97 (1916). However, families today are no longer confined to this narrow pattern. As Justice Powell has noted, "the accumulated wisdom of civilization, gained over the centuries and honored throughout our history . . . supports a larger conception of the family." *Moore v. City of E. Cleveland*, 431 U.S. at 505.

The image of the traditional nuclear family no longer reflects the typical American family. The term "nuclear family" now describes less than one quarter of all households in the United States. *Developments in the Law – The Law of Marriage and Family*, 116 Harv.

-10-

L. Rev. 1996, 2001 (2003); *see also Troxel v. Granville*, 530 U.S. at 63-64; Alison Harvison Young, *Reconceiving the Family: Challenging the Paradigm of the Exclusive Family*, 6 Am. U. J. Gender & L. 505, 506 (1998). Changing social and cultural trends and increased rates of non-marital childbearing and divorce have contributed to this trend.[13] A family unit today "may even include members who are not related by blood [or marriage] but who share common ties of time, geography, and experiences." Ellen Marrus, *"Where Have You Been, Fran?" The Right of Siblings to Seek Court Access to Override Parental Denial of Visitation*, 66 Tenn. L. Rev. 977, 980 (1999).

## IV.

The variety of family living arrangements can present a challenging complexity to the Department's employees when they are called upon to intervene to protect the health, safety, and welfare of children. The statutes that prescribe the Department's role and responsibilities recognize only three parent-child relationships – biological parents, legal parents, and putative biological fathers.

Ascertaining the status of a woman's parental relationship with a child is relatively straightforward. A woman will be considered to be the legal parent of a child (1) if she is the child's biological mother,[14] (2) if she is the child's adoptive parent,[15] or (3) if she was the "gestational carrier" of a child conceived by means of third-parties' donated egg. *In re C.K.G.*, 173 S.W.3d 714 (Tenn. 2005). Ascertaining a man's parental status is less straightforward.

Being a child's biological father is not sufficient, by itself, to qualify a man as a child's legal parent or as a child's putative biological father. A biological father will be considered to be a child's "putative biological father" only if (1) he has filed a petition to establish his parentage of the child,[16] (2) he has filed a timely statement with the putative father registry,[17] (3) the child's mother has identified him as the child's biological father in

---

[13]Single-Parent Families – Demographic Trends, http://family.jrank.org/pages/1574/Single-Parent-Families-Demographic-Trends.html (last visited July 16, 2010); *see also* Deborah H. Wald, *The Parentage Puzzle: The Interplay Between Genetics, Procreative Intent, and Parental Conduct in Determining Legal Parentage*, 15 Am. U. J. Gender Soc. Pol'y & L. 379, 380-81 (2007).

[14]Tenn. Code Ann. § 36-1-102(28)(A) (Supp. 2009).

[15]Tenn. Code Ann. § 36-1-102(28)(E).

[16]Tenn. Code Ann. § 36-1-117(b) (Supp. 2009).

[17]Tenn. Code Ann. § 36-1-117(c)(1).

a sworn, written statement,[18] (4) he has been identified as the child's biological father by information that the court deems to be credible and reliable,[19] (5) he has claimed to certain individuals that he believes that he is the child's biological father,[20] (6) his name is recorded on the child's birth certificate,[21] (7) he is living openly with the child and holding himself out to be the child's father,[22] or (8) he has entered into a permanency plan or plan of care under Tennessee law or under similar laws of other states or territories.[23]

To be considered a child's legal parent, a man (1) must be married to the child's biological mother at the child's birth or the child must have been born within three hundred days after the termination of the marriage or the entry of a decree of separation,[24] (2) must have attempted to marry the child's biological mother prior to the child's birth in apparent compliance with the law, even if the marriage is declared invalid, as long as the child was born during the attempted marriage or within three hundred days after the termination of the attempted marriage,[25] (3) must have been adjudicated to be the child's legal father by a Tennessee court or administrative body with subject matter jurisdiction or by a court or administrative body of any other state, territory, or foreign country,[26] (4) must have signed an unrevoked and sworn acknowledgment of paternity in accordance with applicable Tennessee law or pursuant to the law of any other state, territory, or foreign country,[27] or (5) must be the child's adoptive parent.[28]

Persons other than guardians, foster parents, or others who have been given custody of a child by virtue of a valid court or administrative order have no legally recognized rights with regard to a child unless they are either the child's legal parent, biological parent, or

---

[18]Tenn. Code Ann. § 36-1-117(c)(2).

[19]Tenn. Code Ann. § 36-1-117(c)(2).

[20]Tenn. Code Ann. § 36-1-117(c)(3).

[21]Tenn. Code Ann. § 36-1-117(c)(4).

[22]Tenn. Code Ann. § 36-1-117(c)(5); *see also* Tenn. Code Ann. § 36-2-304(a)(4) (2005).

[23]Tenn. Code Ann. § 36-1-117(c)(6).

[24]Tenn. Code Ann. § 36-1-102(28)(B); *see also* Tenn. Code Ann. § 36-2-304(a)(1).

[25]Tenn. Code Ann. § 36-1-102(28)(C); *see also* Tenn. Code Ann. § 36-2-304(a)(2).

[26]Tenn. Code Ann. § 36-1-102(28)(D).

[27]Tenn. Code Ann. § 36-1-102(28)(D).

[28]Tenn. Code Ann. § 36-1-102(28)(E).

putative biological father. Accordingly, the Department is not required to formally terminate the rights of these persons pursuant to Tenn. Code Ann. § 36-1-113 when it is undertaking to assist with a child's early integration into a safe, stable, and permanent home. However, the Department must comply with Tenn. Code Ann. § 36-1-113 when it seeks to terminate the rights of biological parents, legal parents, and putative biological fathers. Tenn. Code Ann. § 36-1-117(a), (c).

The statutes governing the termination of the rights of biological parents, legal parents, and putative biological fathers further distinguish between persons who are a child's legal parent when a termination proceeding is filed and those who are not.[29] This distinction reflects the Tennessee General Assembly's desire to provide a heightened level of protection to the rights of a legal parent facing termination of his or her rights in comparison to a person who is not a child's legal parent. *Jones v. Garrett*, 92 S.W.3d 835, 839 (Tenn. 2002).

The grounds for terminating the rights of a person who is a child's biological parent, legal parent, or putative biological father are found in Tenn. Code Ann. § 36-1-113(g)(1)-(8), (10). In addition to these grounds, the rights of a person who is not a child's legal parent when a termination petition is filed may be terminated under Tenn. Code Ann. § 36-1-113(g)(9). The grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed. *See In re D.A.H.*, 142 S.W.3d 267, 272-73 (Tenn. 2004).

The grounds for terminating the rights of a person who is not a child's legal parent when a termination petition is filed are easier to prove than the grounds applicable to a person who is a child's biological parent, legal parent, or putative biological father when the termination petition is filed. *See In re Adoption of D.B.S.M.*, No. E2007-02663-COA-R3-PT, 2008 WL 2502118, at *7 (Tenn. Ct. App. June 23, 2008) (No Tenn. R. App. P. 11 application filed); *In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *6-7 (Tenn. Ct. App. Dec. 6, 2004) (No Tenn. R. App. P. 11 application filed). Because of the difference in the grounds for terminating rights under Tenn. Code Ann. § 36-1-113(g), ascertaining whether the person whose rights are sought to be terminated is a legal parent or not is a pivotal threshold question in every proceeding under Tenn. Code Ann. § 36-1-113. *In re S.M.*, 149 S.W.3d at 641.

---

[29]These statutes also govern the termination of the rights of persons who are a child's "guardian" as defined in Tenn. Code Ann. § 36-1-102(24). Because this case does not involve guardians, we have omitted the reference to guardians that can be found in many of the statutes discussed in this case.

**V.**

This case presents the first occasion for this Court to address the Department's statutory obligation to use "reasonable efforts" to preserve, repair, and restore parent-child relationships whenever the circumstances require the Department to intervene in family matters. Because of the importance of family relationships, the Tennessee General Assembly has recognized that children should not be separated from their parents unless the separation is necessary for the children's welfare or is in the interests of public safety. Tenn. Code Ann. § 37-1-101(a)(3) (Supp. 2009); Tenn. Code Ann. § 37-2-401(a) (2005). Even when circumstances require that children be separated from their parents, the Department must use reasonable efforts to make it "possible for the child to return safely to the child's home." Tenn. Code Ann. § 37-1-166(a)(2), (g)(2) (2005).

The Department's statutory obligation to use reasonable efforts to reunite children and their parents plays an important role in termination proceedings under Tenn. Code Ann. § 36-1-113. The Department may delay commencing a termination proceeding if it decides that it has not had sufficient opportunity to use reasonable efforts to provide the services needed to safely reunify the child with his or her parents. Tenn. Code Ann. § 36-1-113(h)(2)(C). By the same token, once the Department commences a termination proceeding under Tenn. Code Ann. § 36-1-113, it may be required to demonstrate that it has used reasonable efforts to reunify the family before a court will grant its termination petition.

The Department is not required to use reasonable efforts to reunite a parent with his or her child every time it removes a child from a parent's custody. For example, in certain statutorily defined "aggravated circumstances,"[30] the Department may reasonably forego efforts to reunify a family and immediately begin termination proceedings under Tenn. Code Ann. § 36-1-113. However, in other circumstances, such as those typically implicated in Tenn. Code Ann. § 36-1-113(g)(1)-(3), the Department may demonstrate that the child's best interests will be served by terminating the parent's rights because the parent "has failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2).

The Department's obligation to provide reasonable efforts to reunify a family arises when it first separates the child from his or her parents. It is triggered by the removal of the child and does not necessarily depend on the legal status of the parents. Thus, in appropriate circumstances, the Department must make reasonable efforts to reunite a child with his or

---

[30] *See, e.g.*, Tenn. Code Ann. §§ 36-1-113(g)(4), (5), (6), (7), (8)(B)(I), (10), 37-1-166(g)(4); *see also In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *6 (Tenn. Ct. App. Mar. 9, 2004) (No Tenn. R. App. P. 11 application filed).

her biological parents or legal parents or even with the child's putative biological father. Accordingly, the Department's obligation to use reasonable efforts to assist a parent in addressing the causes for the removal of the child may also apply to any of the grounds in Tenn. Code Ann. § 36-1-113(g)(9) for terminating the rights of persons who are not the child's legal parent but who are either the child's biological parent or putative biological father.

The General Assembly has characterized the reasonable efforts that the Department must make as "the exercise of reasonable care and diligence by the [D]epartment to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). Accordingly, the manner in which the Department renders services must be reasonable, not herculean. *In re Giorgianna H.*, 205 S.W.3d at 519. In addition, the Department is not required to shoulder the burden alone. The parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required the removal of the children. *State, Dep't of Children's Servs. v. Estes (In re Q.E.)*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008); *In re Tiffany B.*, 228 S.W.3d at 159. The reasonableness of the Department's efforts should be decided on a case-by-case basis in light of the unique facts of the case. *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007). Among the factors that may be used to evaluate the reasonableness of the Department's reunification efforts are: (1) the reasons for removing the child from the parent's custody, (2) the parent's physical and psychological abilities and deficits, (3) the resources available to the parent, (4) the parent's response to and cooperation with the Department's reunification efforts, (5) the resources reasonably available to the Department,[31] (6) the duration and extent of the parent's efforts to address and remedy the conditions that required the removal of the child, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.[32] *In re J.C.D.*, 254 S.W.3d at 446; *In re Giorgianna H.*, 205 S.W.3d at 519.

---

[31]However, the Department may not use budgetary concerns to justify its failure to use reasonable efforts to reunify parents and their children. *In re Tiffany B.*, 228 S.W.3d at 158; *In re Randall B., Jr.*, No. M2006-00055-COA-R3-PT, 2006 WL 2792158, at *5 (Tenn. Ct. App. Sept. 28, 2006) (No Tenn. R. App. P. 11 application filed).

[32]Because the goals of a permanency plan must be reasonable and must be intended to remedy the conditions that caused the child's removal in the first place, *In re Valentine*, 79 S.W.3d at 548-49, the efforts of both the Department and the parent to accomplish goals of little practical consequence are, by definition, not reasonable. *In re C.M.M.*, 2004 WL 438326, at *7 n.25.

# VI.

We now turn to the grounds upon which the juvenile court terminated Junior D.'s rights. While the court terminated Junior D.'s rights based on four statutory grounds,[33] it failed to specify which of these grounds applied to each of the children who were the subjects of the proceeding. This oversight is perhaps best explained by the Department's failure until very late in the proceeding to ascertain Junior D.'s relationship with each of the children. The Department would have been well-advised to have undertaken and completed this task shortly after it obtained custody of the children in November 2004 rather than in January and February 2008.

As the record now stands, Junior D. has distinctly different legal relationships with the children who are the subjects of this proceeding. He is the legal parent of Bernard T.[34] He is the biological parent and legal parent of Judy T. and Joshua T.[35] He is the biological parent and putative biological father of Jacquline T.[36] Finally, he has no legally recognized relationship with Jordan T.[37] Because these relationships differ, all of the grounds relied upon by the juvenile court to terminate Junior D.'s parental rights do not necessarily apply to every one of the children.

The grounds for termination in Tenn. Code Ann. § 36-1-113(g)(2)-(3) apply to legal parents and putative biological fathers. Accordingly, these grounds for termination apply to Junior D.'s relationship with Bernard T., Judy T., Joshua T., and Jacquline T. They cannot apply to Junior D.'s relationship with Jordan T. because Junior D. is not Jordan T.'s legal parent, biological parent, or putative biological father. By the same token, the grounds for

---

[33]Tenn. Code Ann. § 36-1-113(g)(2)-(3), (9)(A)(iv), (9)(A)(vi). The juvenile court appears to have conflated Tenn. Code Ann. § 36-1-113(g)(9)(A)(v) and Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). For the purpose of this opinion, we will presume that the court intended to rely on the ground for termination in Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv).

[34]This conclusion is based on the 2008 genetic testing and on the juvenile court's November 9, 1998 order.

[35]This conclusion is based on the 2008 genetic testing and on the juvenile court's November 9, 1998 order.

[36]This conclusion is based on the 2008 genetic testing and on Tenn. Code Ann. § 36-1-117(c)(6) because Junior D. entered into permanency plans with the Department with regard to Jacquline T.

[37]This conclusion is based on the fact that the 2008 genetic testing excluded Junior D. as Jordan T.'s biological father and on the fact that Jordan T. was not covered by the juvenile court's November 9, 1998 order. Even though Junior D. entered into permanency plans regarding Jordan T., Junior D. cannot be considered to be a putative biological father under Tenn. Code Ann. § 36-1-117(c)(6) because he is not Jordan T.'s biological father.

-16-

termination in Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), (vi) can apply only to Junior D.'s relationship with Jordan T. because, at the time the termination proceeding was filed, Jordan T. was the only child who was neither Junior D.'s biological child, legal child, or putative biological child.

## A.

The termination of Junior D.'s rights with regard to Bernard T., Judy T., Joshua T., and Jacquline T. must be based on either Tenn. Code Ann. § 36-1-113(g)(2) or Tenn. Code Ann. § 36-1-113(g)(3). The juvenile court, consistent with Tenn. Code Ann. § 36-1-113(g)(2), found that the Department proved by clear and convincing evidence that Junior D. had failed to comply with many of the most significant responsibilities in his permanency plans. The court also found that these responsibilities were reasonable and that the Department had used reasonable efforts to assist Junior D. in assuming these responsibilities and accomplishing the goals in the plans. Likewise, consistent with Tenn. Code Ann. § 36-1-113(g)(3), the juvenile court found that the Department proved by clear and convincing evidence that the conditions that required the removal of the children from Junior D.'s custody in 2004 persisted and that there was little likelihood that they would be remedied at an early date.

On appeal, the majority of the Court of Appeals panel that heard this case concurred with the juvenile court's conclusion that the conditions that required the children to be removed from Junior D.'s custody persisted and that there was little likelihood that these conditions would be remedied at an early date. The majority also found that the responsibilities and goals in Junior D.'s permanency plans were reasonable and that Junior D. had failed to comply substantially with many of these goals. However, the majority reversed the termination of Junior D.'s rights under Tenn. Code Ann. § 36-1-113(g)(2) and Tenn. Code Ann. § 36-1-113(g)(3) because it determined that the Department had failed to prove clearly and convincingly that it had made reasonable efforts to assist Junior D. with a number of his responsibilities, particularly with his responsibilities to maintain steady employment and to obtain stable housing.

Based on our review of the record, we respectfully disagree with the majority's assessment of the adequacy of the Department's evidence regarding its efforts to assist Junior D. with the tasks and responsibilities in his permanency plans. By the time of the juvenile court trial in October 2008, the Department had been providing services and support to Junior D. for almost four years. The nature and extent of these services were catalogued in the affidavits filed by the Department in accordance with Tenn. Code Ann. § 37-1-166(c), the Department's case records that were admitted without objection, and the testimony of the family services worker who testified on behalf of the Department.

-17-

The record reflects a deteriorated relationship between Junior D. and the Department. The Department's family services worker testified that Junior D. moved frequently, changed jobs often, and failed to provide prompt, complete, and accurate information regarding his finances, his employment, his living arrangements, and the support group upon which he intended to rely if the children were returned to him. On several occasions, Junior D. interrupted this testimony with comments that the witness was not telling the truth.

When Junior D. took the stand, he conceded that he had not attended a number of programs and sessions that the Department had arranged for him because they conflicted with his work schedule. He also testified that the Department had not provided him any assistance with housing, that he had received no referrals to Health Connect and the South Memphis Alliance, and that the family services worker had somehow "tampered" with the results of the genetic testing. Junior D. did not dispute the Department's evidence that he had not consistently provided his family services worker with current, complete, and accurate information.

While the affidavits and records presented by the Department lack some of the expected specificity regarding the details and outcomes of the services offered and actually provided to Junior D., they substantiate the Department's assertion that, from 2004 to the 2008 hearing in juvenile court, it provided Tina T. and Junior D. with referrals to fourteen or fifteen providers of services and counseling for the purpose of enabling them to comply with the requirements of the permanency plans, including the requirements that Junior D. maintain steady employment and secure stable housing. Accordingly, we concur with the juvenile court's conclusion that the Department presented clear and convincing evidence that it made reasonable efforts to assist Junior D. with satisfying the responsibilities in his permanency plans regarding steady employment and stable housing.

By the time of the hearing in juvenile court in October 2008, Junior D. was a forty-six-year-old high school graduate with no marketable skills. Ever since TVA laid him off in 2005, he had held down a series of low-wage jobs. He had lived with his mother for significant periods of time, and his mother would not permit the children to live with her.

Junior D. admitted that he does not presently have the financial means to support the children involved in this case. Yet, during the hearing, he described his plans to attend college and then enroll in law school and stated that he had saved $9,000 for his education. He also testified that he had purchased a four-bedroom home two months before the hearing but that it was currently uninhabitable because it lacked pipes and interior walls. When asked how he planned to support and care for the children while he worked and went to school, Junior D. responded, "[w]ell, I guess I'll do the best of whatever I got."

This evidence demonstrates clearly and convincingly that the conditions that required the removal of the children in November 2004 continued without substantial change in October 2008 and that there was little likelihood that they would be remedied at an early date. Accordingly, we concur with the findings of both the juvenile court and the majority of the Court of Appeals that the Department presented clear and convincing evidence that supports the termination of Junior D.'s parental rights with regard to Bernard T., Judy T., Joshua T., and Jacquline T. in accordance with Tenn. Code Ann. § 36-1-113(g)(2)-(3).

**B.**

We have already determined that Junior D. is neither the biological father, the legal father, nor the putative biological father of Jordan T. He has not been named the child's guardian, and, at least as far as this record shows, no other court or administrative order exists giving him custody of Jordan T. Accordingly, Junior D. has no legally recognized right to have physical custody of Jordan T.

Despite the lack of evidence of Junior D.'s relationship with Jordan T., the Department, at least until early 2008, considered Junior D. to be Jordan T.'s biological father and treated him as Jordan T.'s putative biological father by entering into a series of permanency plans with him. Thus, for the purposes of this opinion, we will deem Junior D. to be a person who, at the time of the filing of the termination petition, was not the legal parent of Jordan T. for the purpose of Tenn. Code Ann. § 36-1-113(g)(9). As such a person, Junior D.'s rights with regard to Jordan T. can be terminated based only on one of the six grounds in Tenn. Code Ann. § 36-1-113(g)(9), not on any of the other grounds in Tenn. Code Ann. § 36-1-113(g).

The juvenile court terminated Junior D.'s rights based on two of the grounds in Tenn. Code Ann. § 36-1-113(g)(9). First, the court determined, in accordance with Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), that Junior D. had failed to manifest an ability and willingness to assume legal and physical custody of the child. Second, the court determined, in accordance with Tenn. Code Ann. § 36-1-113(g)(A)(vi), that Junior D. had failed to file a timely petition to establish his paternity of Jordan T.

On appeal, the majority of the Court of Appeals panel concluded that Junior D. had failed to manifest an ability and willingness to assume legal and physical custody of Jordan T. The majority also noted that Junior D. had conceded that he had not filed a petition to establish his parentage of any of the children. However, the majority reversed the termination of Junior D.'s rights under Tenn. Code Ann. § 36-1-113(g)(9)(iv) because the Department had failed to demonstrate that its assistance to Junior D. with regard to obtaining and maintaining stable employment and housing met "the less-stringent requirements for the termination of non-legal parents' rights." The majority also reversed the termination of

Junior D.'s rights based on Tenn. Code Ann. § 36-1-113(g)(9)(vi) because the Department had "failed . . . to aid [Junior D.] in establishing himself as the legal father."

There can be little question that Junior D. has manifested a commendable willingness to assume legal custody of all the children, including Jordan T. However, during the hearing in juvenile court, Junior D. conceded that he was unable to support the children financially and that he could not provide them with a stable residence. This testimony alone provides clear and convincing evidence that Junior D. does not presently have the ability to assume legal and physical custody of any of the children.

Despite this evidence, the majority of the Court of Appeals panel declined to terminate Junior D.'s rights based on Tenn. Code Ann. § 36-1-113(g)(9)(iv) because of its dissatisfaction with the evidence of the Department's efforts to assist Junior D. We do not share this dissatisfaction and have previously found that the Department made reasonable efforts to assist Junior D. with regard to the responsibilities and goals in his permanency plans. Because we have found that the Department's efforts passed muster with regard to the grounds for termination in Tenn. Code Ann. § 36-1-113(g)(2)-(3), we likewise find that the Department's efforts are sufficient for the purpose of Tenn. Code Ann. § 36-1-113(g)(9)(iv)-(vi).

## C.

The issue remains regarding the Department's obligation to assist persons, other than legal parents, who have lost custody of children. The majority of the Court of Appeals panel determined that the Department has some responsibility to assist these persons in establishing their parentage. The dissenting judge disagreed, citing the "vague and undefined" nature of the majority's holding and its "practical ramifications" on the Department.

As it did in this case, the Department frequently includes a provision in its permanency plans requiring putative fathers to establish their parentage of their children. This responsibility typically arises long before the Department files or even considers filing a petition to terminate the putative father's rights. Once a putative father assumes this obligation, our law provides him with several ways to accomplish this task. He may, for example, file a petition in a court of competent jurisdiction to establish his parentage in accordance with Tenn. Code Ann. § 36-1-102(28)(D), or he may execute a sworn voluntary acknowledgment of paternity in accordance with Tenn. Code Ann. § 24-7-113 (2000). Once a putative father undertakes either of these actions, he will be deemed to be the legal parent of the child who is the subject of the petition or acknowledgment.[38]

---

[38]A putative biological father who executes a voluntary acknowledgment of paternity and who does
(continued...)

-20-

On the face of it, assisting a putative father with the execution of a voluntary acknowledgment of paternity pursuant to Tenn. Code Ann. § 24-7-113 does not appear to be unduly burdensome on the Department either in terms of time or resources. For biological fathers who decide to obtain a judicial determination of their paternity, the Department's obligation to use reasonable efforts to assist them includes (1) referring them to the appropriate court or referring them to other public or private agencies that can assist them in presenting their petition to the court and (2) providing them with whatever evidence the Department possesses that substantiates their claim.[39] The Department is not obligated to provide putative biological fathers with a lawyer or with funding to retain a lawyer to represent them in a judicial or administrative proceeding to establish their parentage.

The September 2, 2005 permanency plan agreed to by the Department and Junior D. required Junior D. to establish his parentage of the children. The record does not reveal what steps Junior D. took to accomplish this task or the Department's efforts to assist him between 2005 and February 2008. The record does reflect, however, that, when the Department obtained the results of the genetic testing, it provided the results to Junior D. and advised him to take the results to the juvenile court to establish his paternity. Junior D. conceded that he followed the Department's direction but that he was not successful. He did not testify that he informed the Department that his efforts to establish his paternity had failed or that he requested further assistance from the Department to accomplish this task. Under these facts, we find that the record clearly and convincingly establishes that the Department used reasonable efforts to assist Junior D. in establishing his parentage of the children.

## VII.

In addition to presenting clear and convincing evidence establishing at least one statutory ground warranting the termination of a biological parent's parental rights, it is incumbent on the Department to present clear and convincing evidence that terminating the parent's rights is in the best interests of the affected child. Tenn. Code Ann. § 36-1-113(c)(2). *In re Adoption of A.M.H.*, 215 S.W.3d at 809. This determination is guided by a consideration of the factors listed in Tenn. Code Ann. § 36-1-113(i).

---

[38](...continued)
not revoke it will be deemed to be the legal parent of the child. If he is still the legal parent when the Department files a petition to terminate his rights under Tenn. Code Ann. § 36-1-113, the Department cannot rely on the grounds in Tenn. Code Ann. § 36-1-113(g)(9) because he is the child's legal parent.

[39]The Department is not required to investigate or substantiate any claim of parentage. However, when it prepares a permanency plan requiring a putative biological father to establish his parentage, it should be prepared to provide him copies of any evidence it may have in its possession of the sort identified in Tenn. Code Ann. § 37-1-117(c).

By the time of the juvenile court's hearing in this case, the children had been in the custody of the Department, off and on, for almost four years. They had been continuously in the Department's custody since May 2005. During the relatively short periods of time when the children were in Junior D.'s custody, he was unable to care for them adequately. While Junior D. has a relationship with the children and an expressed desire to be their custodial parent, this record demonstrates that he cannot provide a safe and appropriate living environment, financial support, and appropriate parental oversight to the children. It shows, clearly and convincingly, that Junior D. has been unable to make such a lasting adjustment in his circumstances that it appears reasonably possible that the children may be safely returned to him.

The oldest of the five children whose interests are at issue in this proceeding is now over 17-years-old. He is not Junior D.'s biological child, and he was removed from Junior D.'s custody because Junior D. endangered the child's life by failing to attend to his medical needs. The child has been living in a group home for medically fragile children since 2005. The four remaining children have been living in the same foster home, and the Department informed the juvenile court that the foster mother had expressed a desire to adopt the children. Accordingly, for the four youngest children, terminating Junior D.'s parental rights will facilitate and hasten the process of placing them in a stable and permanent home environment.

Junior D. presented little evidence to rebut the Department's evidence that terminating his parental rights would be in the children's best interests. Before this Court, he points out that the Department failed to call the children's foster mother to testify regarding her adoption plans and that the Department did not categorically rule out permitting him to have a relationship with the children even after they were adopted. Neither the Department's failure to call the children's foster mother as a witness nor its openness to permitting Junior D. to maintain some relationship with the children undermines the strength of the Department's clear and convincing evidence that terminating Junior D.'s rights will serve the children's best interests.

**VIII.**

In summary, we have determined that the record contains clear and convincing evidence supporting the juvenile court's decision to terminate Junior D.'s rights with regard to Bernard T., Judy T., Joshua T., and Jacquline T. based on Tenn. Code Ann. § 36-1-113(g)(2)-(3). We have also determined that the record contains clear and convincing evidence supporting the juvenile court's decision to terminate Junior D.'s rights, whatever they may be, with regard to Jordan T. under Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), (vi). In addition, we have determined that the record contains clear and convincing evidence that

the termination of Junior D.'s parental rights with regard to Bernard T., Judy T., Joshua T., Jacquline T., and Jordan T. is in the children's best interests.

Accordingly, we reverse the judgment of the Court of Appeals and affirm the judgment of the Shelby County Juvenile Court terminating the rights of Junior D. with regard to Bernard T., Judy T., Joshua T., Jacquline T., and Jordan T.  The costs of this appeal are taxed to the Department of Children's Services.


_____
WILLIAM C. KOCH, JR., JUSTICE